IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE L. PIERCE, | ) | Case No. 5:20-cv-1108 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Julie L. Pierce, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Pierce's application for DIB be affirmed.

I.      **Procedural History**

On February 24, 2017, Pierce applied for DIB.  (Tr. 196-97).[1]  Pierce alleged that she became disabled on September 20, 2016, due to "1. PTSD; 2. Depressive Disorder; 3. Alcohol Use Disorder; 4. Spinal Stenosis; 6. Neuropathy; 7. Left Shoulder Pain; [and] 8. Disc Degeneration in neck with pain."  (Tr. 196, 219).  The Social Security Administration denied Pierce's application initially and upon reconsideration, during which she reported having been

---

[1] The administrative transcript appears in ECF Doc. 14.

diagnosed with carpal tunnel syndrome. (Tr. 83-99, 101-18, 245). Pierce requested an administrative hearing. (Tr. 138-39). ALJ Gregory M. Beatty heard Pierce's case on February 14, 2019 and denied the claim in a March 19, 2019 decision. (Tr. 19-33, 40-81). On April 1, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). On May 21, 2020, Pierce filed a complaint to obtain judicial review. ECF Doc. 1.

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Pierce was born on January 24, 1969 and was 47 years old on the alleged onset date. (Tr. 196). Pierce graduated from high school and completed one year of college in 1988. (Tr. 49, 220). She had past relevant work as a production manager from 1998 to 2003, production manager from 2004 to 2005, operations manager from 2005 to 2007, sales representative from 2007 to 2009, and insurance and billing clerk from May 2011 to September 2016. (Tr. 32, 220).

### B. Relevant Medical Evidence

#### 1. Physical Impairments

The ALJ's written decision summarized the relevant medical evidence concerning Pierce's physical impairments. (Tr. 28-30). An independent review does not reveal any material inconsistencies between the ALJ's summary of the facts pertaining to Pierce's physical impairments and the record before this Court. *Compare* (Tr. 27-32), *with* (Tr. 233-41, 316-50, 354-475, 486-524, 542-649, 672-75, 705-46, 747-814, 864-968, 1034-96). Thus, the court adopts and incorporates by reference the ALJ's summary of the medical evidence pertaining to Pierce's physical impairments.[2]

---

[2] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted*

2.      **Mental Impairments**

Pierce focuses her challenge to the ALJ's consideration of the medical and opinion

evidence regarding her mental health impairments at Steps Three and Step Four of the sequential

evaluation; thus, the court will summarize the relevant medical and opinion evidence.

On October 6, 2016, Pierce presented to Ellen Harrington, Ph.D., for a psychological

evaluation due to post-traumatic stress disorder ("PTSD") symptoms.  (Tr. 351-52).  Her most

significant trauma occurred three years earlier, when she was drugged and sexually assaulted

while unconscious.  (Tr. 351).  She learned of the event when she woke up the next morning and

saw the assailant still there.  (*Id.*).  Her symptoms included: cognitive avoidance; avoidance of

people, places, and things; anhedonia; detachment; numbed feelings; foreshortened future; sleep

difficulties; irritability; concentration difficulties; and hypervigilance.  (*Id.*).  Her main coping

mechanism was alcohol – ten liters per week.  (*Id.*).  She also reported a history of major

depressive disorder ("MDD").  (*Id.*).  Dr. Harrington noted that Pierce's social interaction

appeared to be increasing since starting the general mental health intensive outpatient program.

(Tr. 352.).  And Pierce was recently fired from a job that had been a significant source of stress.

(*Id.*).  Dr. Harrington diagnosed Pierce with PTSD, moderate MDD, and severe alcohol use

disorder and prescribed therapy at the Summa Health Traumatic Stress Center.  (*Id.*).

On December 16, 2016, Pierce began treatment with Thomas Robb, D.O.  (Tr. 525).  She

indicated her weight had increased by 40 pounds over the years past 5 years and she sometimes

ate without being hungry.  (*Id.*).  She continued to suffer depression, including lack of interest,

low energy, feelings of failure, and brief thoughts of suicide.  (*Id.*).  She decreased her drinking

---

*by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd*
by 139 S. Ct. 1148 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v.
Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

to three drinks in the evening.  (*Id.*).  A mental status exam showed: mild anxiety PTSD symptoms and depression; Pierce was well developed with adequate tone and gait; she was appropriately dressed with adequate hygiene; her speech was clear, with no elicited delusions, hallucinations, or homicidal indications; she was oriented in time, place, and person with adequate memory; and she had adequate concentration in conversation.  (*Id.*).  Dr. Robb prescribed Cymbalta and encouraged proper diet, personal/spiritual growth, and exercise.  (Tr. 526).

On February 24, 2017, Pierce presented to Dr. Robb with mild depression, increased flashbacks since starting therapy, interrupted sleep, and decreased alcohol use.  (Tr. 527).  Dr. Robb substituted Cymbalta with Zoloft for Pierce's depression and additionally prescribed hydroxyzine for her anxiety and trazodone for insomnia.  (*Id.*).  He diagnosed her with PTSD, and MDD single episode, in partial remission.  (*Id.*).  On March 22, 2017, Pierce presented to Dr. Robb with continued depression, PTSD, and anxiety.  (Tr. 528-29).  He increased her Zoloft dosage and continued medication.  (Tr. 529).

From June 22, 2017 to December 19, 2018, Pierce received treatment at Coleman Behavioral Health related to her trauma.  (Tr. 676-700, 816-62, 970-1032).  On her June 22, 2017 diagnostic assessment, Pierce reported that her alcohol consumption had decreased to one or two glasses of wine a couple of times per week, but she also reported abusing alcohol daily.  (Tr. 681, 691).  She recently had started physical therapy and yoga, which helped her connect with people, and she had lost 50 pounds.  (Tr. 686-87).  Pierce listed the following problems: (1) depressed mood; (2) anxiety resulting from several break-ins into her home; (3) traumatic stress resulting from her mother's suicide attempts, her father leaving the home, her rape, her car accidents, and the recent discovery that her neighbor had been breaking into her home and taking

4

things; (4) impulsive shopping despite being unable to afford it and impulsive drinking as a coping mechanism; (5) mood swings; and (6) sleep problems.  (Tr. 676, 683-84).  Pierce claimed severe impairment in health practices, managing money, problem solving, alcohol use, leisure, social networking, productivity, coping skills, and behavioral norms.  (Tr. 685-86).  She claimed mild impairment in nutrition, very mild impairment in personal hygiene, and no impairment in grooming or dressing.  (Tr. 685-86).  Upon examination, her demeanor was average, withdrawn, cooperative, and restless; mood was nervous and tearful; affect was congruent, appearing tearfully anxious, nervous, and overwhelmed; no suicidal ideations; and unremarkable cognitive impairment.  (Tr. 687-88).  Tammy Morris, PCC, diagnosed Pierce with PTSD; MDD recurrent, unspecified; and severe alcohol use disorder.  (Tr. 690-91, 693).  Morris recommended counseling, psychiatry, and case management.  (Tr. 692).

On August 9, 2017, Pierce reported that she had forced herself to go to yoga and tried to reconnect with a former coworker.  (Tr. 694).  She was doing yoga almost every day, which helped her relax and socialize.  (Tr. 696).  She was also receiving trauma treatment and group therapy.  (*Id.*).  She continued to struggle with depression, anxiety, frustration, and worry, as well as relationships, day-to-day function, and trauma.  (Tr. 694).  Despite "doing better," Pierce reported struggling with compulsive behaviors to self sooth, such as self-medicating with alcohol, shopping, eating, buying groceries she did not need, and drinking to enable sleep.  (Tr. 696).  Upon examination, Pierce appeared well groomed; her build was average; her demeanor was preoccupied and hostile; her behavior was cooperative, agitated, and impulsive, with tremors; her mood was angry, agitated, tearful depressed, anxious, and upset; her affect was congruent; she had persecutory delusions; and she reported no impairment, including attention and concentration.  (Tr. 694-95).

On August 23, 2017, Pierce reported that she was "not so good, took a nose dive." (Tr. 698). She had suffered a panic attack while at Ikea due to crowding, missed her trauma treatment and group therapy meetings, had skipped yoga and pain management services to stay in bed, was drinking more, and spiraled into a depressed mood. (Tr. 698-700). Pierce also helped her sister move and began to cry when thinking about how she would never have her sister's life. (Tr. 698). Upon examination, Pierce appeared well groomed; her build was average; she was preoccupied and hostile; she was cooperative, impulsive, and agitated with tremors; her affect was congruent; her mood was angry, agitated, tearful depressed, anxious, and upset; she had persecutory delusions; and no reported cognitive impairment, including attention and concentration. (Tr. 698-99). Morris described Pierce as in severe emotional distress with distraught crying. (Tr. 700).

On September 13, 2017, Pierce visited Steffany Morton, M.D., for psychiatric evaluation. (Tr. 816-23). Pierce reported experiencing anxiety, lack of self-care, stress-related panic attacks, and low appetite. (Tr. 816). Upon examination, Pierce appeared well groomed and displayed an average build and demeanor; cooperative behavior; "ok" mood; labile affect; no delusions; and no cognitive impairment, including concentration and attention. (Tr. 820-21). Dr. Morton confirmed her PTSD, MDD, and severe alcohol use diagnoses and continued Pierce's medication. (Tr. 821-23).

On October 23, 2017, Pierce reported increased energy, no depression, not finishing projects, racing thoughts, and increased speech. (Tr. 824). She had relapsed on alcohol consumption two weeks before but had gone 13 days without drinking and was considering Alcoholics Anonymous. (*Id.*). Upon examination, Pierce appeared to have good hygiene and

normal gait; average and cooperative demeanor; full affect; and unremarkable cognitive

impairment.  (Tr. 825-26).  Dr. Morton continued Pierce's medication.  (Tr. 827).

On November 27, 2017, Pierce felt overwhelmed after a recent bladder cancer surgery,

but felt she could handle the situation appropriately.  (Tr. 830).  Pierce had been sober for over a

month and her depression was improving, although she reported some financial stress.  (Tr. 830,

833).  Upon examination, her gait was normal and displayed average and cooperative demeanor;

"OK/Restricted" mood and affect; and unremarkable cognition and orientation.  (Tr. 831-32).

Dr. Morton continued Pierce's medications.  (Tr. 834).

On January 16, 2018, Pierce presented with financial stressors, lack of motivation,

fatigue, hopelessness, helplessness, crying, poor appetite, poor sleep, and rated her depression as

"9/10."  (Tr. 836).  She also reported anxiety associated with depression, mood swings, and

irritability.  (*Id.*).  Upon examination, Pierce appeared casually dressed, groomed, and fully

oriented and displayed normal gait and station; average and cooperative demeanor; depressed,

constructed, and tearful mood; and unremarkable cognition and orientation.  (Tr. 838).  Scott

Rohrbaugh, CNP, continued medication, adding Abilify.  (Tr. 840).

On May 1, 2018, Pierce stated that she was doing "OK" and had started working

part-time.  (Tr. 842).  She reported feeling irritable at work, poor energy, poor motivation,

interrupted sleep, chronic pain, increased appetite, and interpersonal problems with coworkers.

(*Id.*).  Her depression was slightly worse over the previous month.  (*Id.*).  There was no current

substance abuse.  (Tr. 845).  Her examination results were the same as in January 16, 2018.  (Tr.

844).  Dr. Morton increased Pierce's Wellbutrin and continued medication. (Tr. 846).

On June 25, 2018, Pierce reported doing a "little better," but "really depressed for the

past 7 days."  (Tr. 849).  Her depression had improved, and she felt hopeful and with more

energy.  (*Id.*).  She had no problems with sleep or appetite.  (*Id.*).  But Pierce felt some anxiety over being transferred to a new trauma therapist.  (*Id.*).  She continued to work, was getting along well with coworkers, and felt "they work well as a team."  (*Id.*).  Pierce received financial help from her family and had started yoga again.  (*Id.*).  No substance use was reported.  (Tr. 852).  Upon examination, Pierce appeared casually dressed, groomed, and fully oriented; her gait and station were normal; her demeanor was average and cooperative; her mood was "Better/Flexible;" and cognition and orientation were unremarkable.  (Tr. 851-52).  Dr. Morton continued medication.  (Tr. 853).

On August 20, 2018, Pierce reported increased crying and feeling more depressed over the previous six weeks.  (Tr. 856).  She discontinued trauma counseling and worked only with her individual counselor.  (*Id.*).  Upon examination, Pierce appeared casually dressed, groomed, and fully oriented and displayed normal gait and station; average and cooperative demeanor; "OK/Flexible" mood; and unremarkable cognition and orientation.  (Tr. 858-59).  Dr. Morton noted "Questionable ongoing" alcohol use and continued medication.  (Tr. 859-60).

On August 23, 2018, Pierce returned to counseling.  (Tr. 977).  She reported improved symptoms of depression and anxiety but was still struggling with household chores.  (Tr. 978).  She also reported improved functioning despite ongoing PTSD symptoms.  (*Id.*).  She had improved interaction, was going out more and socializing, and had been going to concerts but was drinking more often.  (Tr. 978-79).  Upon examination, Pierce appeared well groomed and displayed average build and demeanor; cooperative behavior; sad and frustrated mood; congruent affect; and no cognitive impairment.  (Tr. 977-78).  Her August 30, 2018, appointment was identical.  (Tr. 982-85).

On September 20, 2018, Pierce indicated that she had been in communication with an old friend, had been trying to cut down on drinking, and was improving interaction and going out more.  (Tr. 986-87).  Upon examination, she appeared well groomed and displayed average build and demeanor; cooperative behavior; frustrated mood; congruent affect; and no cognitive impairment.  (Tr. 986-87).

On September 27, 2018, Pierce indicated that she had cut down on her drinking, stopped smoking, and was able to manage an anxiety-provoking situation at work.  (Tr. 990-92).  Upon examination, Pierce appeared well groomed and displayed average build and demeanor; cooperative behavior; cheerful mood; and no cognitive impairment.  (Tr. 990-91).

On October 9, 2018, Pierce visited Dr. Morton, reporting financial stressors, an emotional affair with an ex-boyfriend, interpersonal issues with her mother, worsening depression ("6/10") and anxiety since the affair began, some anxiety attacks at work, at least one drink per day with occasional binges, and improved sleep.  (Tr. 1000, 1003).  Upon examination, Pierce appeared casually dressed, groomed, and fully oriented; her gait and station were normal; her demeanor was average and cooperative; her mood was "OK/Flexible;" and her cognition was unremarkable.  (Tr. 1002-03).  Dr. Morton added unspecified anxiety and personality disorder to Pierce's diagnoses and continued medication.  (Tr. 1004-05).

On October 18, 2018, Pierce visited her counselor, stating that she was very emotional after a recent breakup.  (Tr. 995-97).  She had increased drinking and started smoking again.  (Tr. 996-97).  Upon examination, Pierce appeared well groomed and displayed average build and demeanor; cooperative behavior; sad mood; full affect; and no cognitive impairment.  (Tr. 995-96).  On October 31, 2018, Pierce reported medical concerns due to shaking and losing weight, financial stressors, and sadness associated with her breakup.  (Tr. 1007-09).  She had not had a

drink in four days and was trying to not let drinking get out of control. (Tr. 1009). Upon examination, Pierce appeared well groomed and displayed average build and demeanor; cooperative behavior; cheerful mood; full affect; and self-reported memory, attention, and concentration impairment. (Tr. 1007-08).

On November 13, 2018, Pierce visited Dr. Morton, stating that her depression had worsened over the previous month. (Tr. 1012). She had ongoing financial stressors, missed a house payment, felt overwhelmed and fatigued, and feared that her family would cease financial help. (*Id.*). Despite having bills due, she spent money on new shoes and sweaters and concert tickets. (*Id.*). Pierce was also drinking a box of wine every five days. (Tr. 1012, 1015). Upon examination, she appeared casually dressed and groomed; had average and cooperative demeanor; "OK/Flexible" mood; and unremarkable cognition. (Tr. 1014-15). Dr. Morton continued her medication. (Tr. 1017).

On November 14, 2018, Pierce presented to counseling, indicating that her brother in law did not want her sister to give her money. (Tr. 1019). Pierce had been shopping a lot with money she did not have. (Tr. 1021). Upon examination, Pierce appeared well groomed and displayed average build and demeanor; cooperative behavior; sad and frustrated mood; full affect; and memory and attention/concentration impairment. (Tr. 1019-20). On December 5, 2018, Pierce stated that she had been drinking on and off, spent money she did not have, and struggled with regulating her emotions. (Tr. 1026). On December 18, 2018, Pierce reported increased symptoms of depression related to the holidays and family stressors. (Tr. 1030). She continued to struggle with household chores, PTSD symptoms, and pain. (*Id.*). She continued to drink on and off. (Tr. 1031). Pierce's December examination results were identical to those of her November 14, 2018 visit. (Tr. 1024-25, 1029-30).

10

### C.      Relevant Opinion Evidence

#### 1.      Physical Impairments

On May 20, 2017, state agency consultant Elizabeth Das, M.D., evaluated Pierce's physical capacity based on a review of the medical record and determined that Pierce had the physical residual functional capacity ("RFC") to perform light work.  (Tr. 91-94, 98). Specifically, Dr. Das stated that Pierce could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk/sit about 6 hours; occasionally push/pull with her left arm due to pain and decreased range of motion; frequently climb ramps/stairs; kneel; occasionally balance, stoop, crouch, and crawl; and never climb ladders/ropes/scaffolds.  (Tr. 93-94).  On August 24, 2017, Obiaghanwa Ugbana, M.D., concurred with the physical functional assessments in Dr. Das's opinion.  (Tr. 111-13, 117).

#### 2.      Mental Impairments

##### a.      Treating Psychologists – Stacey Bradbury, Ph.D., and Ellen Harrington, Ph.D.

On March 7, 2017, Stacey L. Bradbury, Ph.D., and Dr. Ellen Harrington submitted a joint letter stating that Pierce had attended 22 outpatient therapy sessions at Summa Health Traumatic Stress Center since January 2017, in addition to intensive outpatient group sessions.  (Tr. 481). They opined that, given the severity of Pierce's PTSD symptoms, it was reasonable to assume that she would endure "significant functional impairment in a work setting."  (*Id.*).  They noted that Pierce experienced high levels of emotional deregulation, making it difficult to tolerate distress, and struggled to regularly and effectively implement coping skills.  (*Id.*).  They stated that her symptoms previously had impaired her ability to functional well and perform in a work setting, and it was reasonable to assume that it would continue to be the case.  (*Id.*).  They further stated that despite some progress, Pierce was still "significantly functionally impaired."  (*Id.*).

11

However, they noted in closing that "assessment of Ms. Pierce's work-related functional limitations is beyond my scope of practice."  (*Id.*).

Dr. Bradbury and Dr. Harrington prepared a form RFC assessment based on clinical evidence, subjective complaints, and their expertise/training.  (Tr. 482-84).  In a table regarding Pierce's mental abilities and aptitude, they indicated that Pierce could handle low work stress. (Tr. 482).  They further opined that Pierce had marked limitation regarding her ability to concentrate, persist, or maintain pace and extreme limitation in her ability to adapt or manage herself.  (Tr. 483).  They stated that Pierce's subjective complaints were consistent with their diagnoses and limitations and that alcohol use did not materially factor into their opinion.  (Tr. 484).

On May 8, 2017, Dr. Bradbury and Dr. Harrington submitted a second letter.  (Tr. 650). They stated that Pierce had attended 39 outpatient individual psychotherapy sessions and had completed an intensive outpatient program.  (*Id.*).  They noted that she had shown regular progress but cautioned that work-related functional limitations were beyond their scope of practice.  (*Id.*).

Dr. Bradbury and Dr. Harrington also submitted a "mental status questionnaire," stating as follows.  (Tr. 651-53).  Pierce regularly came to appointments appropriately dressed and had made significant improvements in her appearance since first starting treatment.  (Tr. 651).  Her mood and affect were poor as she regularly struggled with coping with strong, distressing emotions.  (*Id.*).  She showed signs and symptoms of severe anxiety, particularly in situations that were triggers, but her anxiety spanned across a number of situations.  (*Id.*).  Pierce self-reported "significant deficits" in concentration on a regular basis.  (*Id.*).  There were no observed difficulties in other areas of cognitive functioning and no testing was done to evaluate

12

her cognitive functioning.  (*Id.*).  Pierce showed acceptable insight and judgment in treatment, with no use of alcohol as a primary means of coping.  (*Id.* at 651-52).  Pierce suffered from PTSD, MDD (severe), and alcohol use disorder (severe, in remission).  (Tr. 652).  Pierce showed significant improvement in treatment, which was expected to continue.  (*Id.*).

Dr. Bradbury and Dr. Harrington further opined that Pierce was capable of managing benefits and had a good ability to remember, understand, and follow instructions.  (*Id.*).  Pierce had a good ability to maintain attention, but she self-reported poor attention.  (*Id.*).  During treatment, Pierce was able to sustain concentration, persist at tasks, and complete tasks regularly with mild to moderate distress, but she self-reported that she struggled regularly outside the structure of the clinic.  (*Id.*).  Pierce reported difficulties in social interactions, particularly in stressful situations, and low distress tolerance.  (Tr. 653).  Pierce also reported difficulty coping with change and an inability to cope with the stressors of work or work-like environments.  (*Id.*).

Dr. Bradbury and Dr. Harrington also completed a "Daily Activities Questionnaire," stating that Pierce: lived alone, self-reported difficulty keeping up with household chores and financial stress; self-reported a history of difficult family, friend, and neighborly relationships; visited family up to two times and friends up to three times weekly; self-reported a history of strained relationships with supervisors and coworkers; self-reported being able to prepare her own food; self-reported difficulty maintaining her home due to lack of motivation; self-reported difficulty regularly showering, though Pierce never appeared unkempt or unclean; self-reported significant difficulty with financial management, including financially allocating appropriate funds for shopping/groceries; had no concerns with driving and could do so independently; reported no issues with banking or paying her bills on time; self-reported regular participation in hobbies; received assistance from her mother with household chores and from friends and family

to get her active and involved in hobbies; reliably attended appointments; and had no compliance issues.  (Tr. 665-66).  They noted, "It is expected that [p]oor distress/stress tolerance, regular absences from work, interpersonal difficulties, and difficulties with sustained concentration will likely prevent [Pierce] from engagement in work activities."  (Tr. 665).

On October 10, 2017, Dr. Bradbury, Dr. Harrington, Megan Conrad, Ph.D., and Emily Hionides-Horner, MSW, LISW-S, submitted a third joint letter.  (Tr. 702-03).  They indicated that Pierce had attended 55 outpatient therapy sessions.  (Tr. 702).  They indicated that her symptoms warranted therapeutic intervention five days per week and reiterated that Pierce reported psychological symptoms that impaired her ability to function well and perform in a work setting in the past.  (*Id.*).  Pierce further reported that she experienced high levels of emotional deregulation that made it difficult for her to tolerate her distress, and she struggled to regularly and effectively implement coping skills.  (*Id.*).  Given the similarity between her past PTSD symptoms, they indicated that it was reasonable to assume that Pierce would exhibit significant functional impairment in a work setting.  (*Id.*).  They again cautioned, however, that an assessment of Pierce's work-related functional limitations was beyond their scope of practice. (*Id.*).

### b.    Treating Physician – John Daubney, Ph.D.

On March 29, 2017, John Daubney, Ph.D., wrote a letter indicating that he had treated Pierce from September 10, 2014 to June 6, 2016.  (Tr. 537).  He observed that Pierce was always well groomed and dressed and slightly depressed.  (*Id.*).  She had low anxiety and appropriate concentration, memory, and abstract reasoning and appeared capable of managing benefits. (*Id.*).  He noted no functional imitations or problems with cognition, maintaining attention, concentration, persistence at tasks, or completing tasks in a timely fashion or in social interaction

14

or adaptation.  (*Id.*).  When Dr. Daubney last saw Pierce, she was alone with no problems or deficits that would prevent independent living, and she was generally able to get along with former employers, supervisors and coworkers.  (Tr. 538).  Although she initially presented with tardiness, it was quickly resolved.  (*Id.*).  Pierce occasionally complained of physical problems that impeded her work.  (*Id.*).  In Dr. Daubney's opinion, Pierce was able to take care of feeding herself, household chores, personal hygiene, shopping, and paying bills.  (*Id.*).

### c.    Non-Medical Source – Kathy Keller

On January 15, 2019, Kathy Keller completed a "Work Activity Questionnaire" of Pierce's performance as a mail room production worker at Coleman Data Solutions since she began working on January 22, 2018.  (Tr. 293-95).  Keller indicated that Pierce worked 24 hours per week, completed all of her usual duties, completed her job duties without special assistance, and completed her work in the same amount of time as her coworkers.  (Tr. 293).  However, Pierce did not regularly report to work as scheduled, was frequently absent, and received frequent absences as an accommodation.  (Tr. 293-94).  Keller rated Pierce's productivity at 80% that of other employees and stated that Pierce's work was not satisfactory when compared to that of other employees.  (Tr. 294).

In an attached letter, Keller stated that Pierce did well on a daily basis, but there had been several questionable events regarding her mental stability.  (Tr. 295).  Keller noted that Pierce had a verbal altercation with another employee on one occasion, and the situation was tense for several weeks before being resolved.  (*Id.*).  Pierce also showed anger and dismay publicly regarding an employee who smoked while pregnant.  (*Id.*).  Keller stated that Pierce was tardy often, which Keller believed was due to Pierce's anxiety levels.  (*Id.*).  Keller noted that Coleman

Data Solutions was lenient in their attendance policy because 75% of their employees had some disability, but Pierce tended to be tardy and/or absent more than others in her department.  (*Id.*).

### d.      State Agency Consultants

On May 18, 2017, Bruce Goldsmith, Ph.D., evaluated Pierce's mental capacity based on a review of the medical record.  (Tr. 90-93, 95-96).  Dr. Goldsmith considered Listings 12.04 (Depressive, Bipolar, and Related Disorders) and 12.15 (Trauma- and Stressor-Related Disorders), but determined that Pierce did not satisfy the Paragraph B criteria because she only had mild impairment in her ability to understand, remember, or apply information and moderate impairment in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (Tr. 90-91).  Dr. Goldsmith determined that Pierce had sustained concentration and persistence limitations and social interaction limitations but no understanding and memory limitations.  (Tr. 95-96).

Dr. Goldsmith found no significant limitation in Pierce's ability to carry out short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted; making simple work-related decisions; get along with coworkers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take precautions; travel or use public transportation; and set realistic goals or make plans independently.  (*Id.*).  He found moderate limitation in Pierce's ability to carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday or workweek without interruption; perform at a consistent pace without an unreasonable number of rest periods; interact appropriately with the general public; accept

instructions and respond appropriately to criticism; and respond appropriately to changes in the work setting.  (*Id.*).  On August 25, 2017, Paul Tangeman, Ph.D., concurred with the mental functional assessments in Dr. Goldsmith's opinion.  (Tr. 109-10, 114-15).

### D.     Relevant Testimonial Evidence

Pierce testified at the February 14, 2019 ALJ hearing.  (Tr. 41-74).  She worked part-time at Coleman Data Solutions earning minimum wage, which was not enough to pay bills.  (Tr. 46-47).  She received some help from her family.  (Tr. 47).  Pierce drove to work, but sometimes the numbness in her feet would not allow her to feel the pedals.  (Tr. 47-48).  She worked about as far as she could drive.  (Tr. 49).  At Coleman, Pierce sorted through files, placed them in piles, and categorized them.  (Tr. 56).  It was very hard for Pierce to sit for six hours at a time despite efforts to make it more comfortable.  (*Id.*).  She often called off work due to anxiety associated with work and dealing with and being around people.  (Tr. 56-57).  Pierce had problems at her previous job at well.  (Tr. 59).  Before being terminated for insubordination, she had been getting increasingly agitated and irritated, cried often and openly, and could not concentrate due to noise.  (*Id.*).

Pierce testified that she had three drinks during the week and a couple on the weekends.  (Tr. 61-62).  Her alcohol use had not, however, ever prevented her from going to work as she only drank at night.  (Tr. 62).  She kept seven cats, three outside the home and four inside.  (*Id.*).  The day before the hearing, a representative typical day, Pierce got up, fed her cats, got coffee, took her medication, and got on the computer.  (Tr. 63).  She noticed an e-mail stating that her credit cards had been closed, which she did not believe because "I always make my payments on time."  (*Id.*).  Pierce chatted with a representative, who told Pierce that the closure was due to a bad credit score.  (*Id.*).  Pierce then took a shower, which she did not do often, for the first time

17

in over a week.  (*Id.*).  She then got dressed and drove to work.  (Tr. 63-64).  On the way, she got

in two traffic jams, making her really anxious.  (Tr. 64).  When she saw accidents, she would

suffer flashbacks and cry.  (*Id.*).  Pierce called in late and arrived eight minutes late.  (*Id.*).  She

then worked for six hours and returned home.  (*Id.*).  Once home, she talked to the mother, texted

her friend, got on the computer, and watched television until she fell asleep.  (Tr. 64-65).  She

woke up at 11:30 p.m. but was too nervous about the upcoming hearing to go back to sleep until

3:00 a.m.  (Tr. 65).

Pierce testified that she had a shopping addiction and over $10,000 in credit card debt.

(Tr. 65).  The last time she did online shopping was two days before the hearing, and she

purchased second-hand clothing that she did not need.  (Tr. 65-66).  The last time she "probably

had too much to drink" was a few weeks before the hearing, on her birthday.  (Tr. 67).

During questioning from counsel, Pierce testified that she was worst physically in the

morning.  (Tr. 67).  She needed to roll her ankles around, stretch her back, and sit for a minute.

(Tr. 67-68).  Pierce had motivation problems as well.  (Tr. 68).  She would set four alarms to

wake up, all of which she sometimes ignored and called off work due to too much anxiety or

depression.  (*Id.*).  In a normal month, she called off work once a week or more.  (*Id.*).  Although

she had cats, she did not clean up after them regularly or as much as she should because it was

difficult to bend over.  (Tr. 68-69).  She was able to cook and feed herself, but she did not always

have the motivation to do so.  (Tr. 69).  She did not wash dishes regularly due to back pain after

standing for any length of time.  (Tr. 69-70).  Her stepfather helped with cleaning after the cats

and her mother delivered kitty litter and cat food.  (Tr. 70).  Her mother sometimes did her

laundry.  (*Id.*).  She could go grocery shopping but tried to have someone with her to carry the

bags.  (Tr. 71).  At work, coworkers did the lifting for her because the boxes were around 40

pounds.  (Tr. 72).  Going through one file would cause her wrists to give out and need rest.  (Tr. 72-73).

## III.    The ALJ's Decision

On March 19, 2019, the ALJ issued a written decision denying Pierce's claim.  (Tr. 22-33).  The ALJ made the following paraphrased findings relevant to Pierce's arguments in this case:

1.   The date last insured was December 31, 2021.  (Tr. 24).

3.   Pierce had the severe impairments of: cervical and lumbar degenerative disc disease, obesity, carpal tunnel, depressive disorder, PTSD, and alcohol addiction disorder.  (Tr. 25).

4.   Pierce had no impairment or combination of impairments that met or medically equaled the severity of the listed impairments.  (*Id.*).

No treating or examining physician indicated findings that would satisfy the severity requirements of any listed impairment.  In reaching the conclusion that Pierce did not have an impairment or combination of impairments that met or medically equaled a listed impairment, the ALJ also considered the opinion of the state agency medical consultants who evaluated the issue at the initial and reconsideration levels and reached the same conclusion.  (*Id.*).

The severity of the Pierce's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of Listings 12.04 and 12.15.  In making that finding, the ALJ considered whether the Paragraph B criteria were satisfied – the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning.  (*Id.*).

Pierce had no more than moderate impairments in any of the four areas of functioning.  Because Pierce's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the Paragraph B criteria were not satisfied.  (Tr. 26).

5.   Pierce had the RFC to perform light work except: occasional pushing and pulling with the left upper extremity; occasional reaching overhead to the left, and occasionally reaching overhead to the right; otherwise frequent reaching to the left and to the right; frequent handling bilaterally; frequent fingering limitations with both hands; frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, crouching, stooping, and crawling; and no work at unprotected heights, moving mechanical parts, and operating a motor

19

vehicle.  Pierce was able to perform simple, routine, and repetitive tasks but not at a production rate pace; interact with supervisors, coworkers, and the public occasionally; and tolerate few changes in a routine work setting.  (Tr. 27).

In making his RFC determination, the ALJ considered all Pierce's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  And the ALJ provided an exhaustive discussion of the medical record.  The ALJ also considered the opinion evidence.  (*Id.*; *see* Tr. 27-30).

As for the opinion evidence . . . "Dr. Bradbury's March 7, 2017 opinion that Pierce had marked impairment in her ability to concentrate, persist, or maintain pace and in her ability to adapt or manage herself (6F [Tr. 481-85]) was given little weight because it was inconsistent with more recent medical evidence of record and Pierce's activities of daily living."  (Tr. 30-31).

"Another letter signed by Dr. Bradbury, other psychologists, and a therapist from Summa Health dated October 10, 2017 indicates the claimant completed an intake evaluation on September 2, 2016 at Summa Health Traumatic Center and was diagnosed with [PTSD, MDD], and Alcohol Use Disorder."  The letter stated that, "given the severity of Pierce's trauma-related symptoms is similar to what she has experienced in the past, it is reasonable to assume that Pierce would exhibit significant functional impairment in a work setting at this time, although it noted that an assessment of her work-related functional limitations is beyond their scope of practice (17F [Tr. 702-04]).  This statement is also given little weight, as it is based primarily on the claimant's report, and it is inconsistent with more recent medical evidence of record and the claimant's activities of daily living."  (Tr. 31).

"In sum, the above [RFC] is supported by the medical evidence of record, medical source opinions, and the claimant's activities of daily living."  (Tr. 32).

10.  Considering Pierce's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Pierce could form, such as routing clerk, mailroom clerk, and hand packager/inspector.  (Tr. 32-33).

Based on these findings, the ALJ determined that Pierce was not disabled and denied her claims.

(Tr. 33).

20

## IV.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

21

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence

at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

> **B.    Step Three – Listings 12.04 and 12.15**

Pierce argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating whether her mental impairments met or medically equaled Listings 12.04 and 12.15.  ECF Doc. 15 at 10-13.  She argues that the ALJ failed to apply proper legal standards because the ALJ never cited the record in making his Step Three evaluation.  ECF Doc. 15 at 11.  Pierce argues that the ALJ should have found that she satisfied the Paragraph B criteria because she had marked limitations in two areas of functioning. ECF Doc. 15 at 11-13.  Evidence of weight loss due to her depression and PTSD symptoms, problems cooking meals, money troubles and mismanagement of funds for shopping, issues reporting to work appropriately and on time, only 80% productivity relative to her coworkers, and Dr. Bradbury's and Dr. Harrington's opinion of extreme limitations, she argues, established that she had extreme limitations in concentrating, persisting, or maintaining pace.  ECF Doc. 15 at 11-12.  She argues that she should have been found to have extreme limitations in her ability to adapt or manage herself based on: Dr. Bradbury and Dr. Harrington's opinion of extreme limitations; evidence of issues bathing, wearing dirty clothes, eating irregularly, and caring for her cats; coworker Keller's statement that she had a verbal altercation at work and showed anger and public dismay at a coworker; and her June 22, 2017 35.5 GAF score.  ECF Doc. 15 at 12-13.

The Commissioner responds that the lack of pinpoint citations to the record is not grounds for reversal.  ECF Doc. 17 at 7-8.  The Commissioner further argues that substantial evidence supported the ALJ's Step Three finding that Pierce did not satisfy the Paragraph B criteria for Listings 12.04 and 12.15.  ECF Doc. 17 at 6-10.  The Commissioner argues that the

ALJ's reference to Pierce's ability to drive, prepare meals, watch television, read, play games, manage funds, use the internet, and manage her care and the lack of evidence of distractibility reasonably supported the ALJ's finding of less than marked limitations in her ability to concentrate, persist, or maintain pace.  ECF Doc. 17 at 7.  The Commissioner further argues that the ALJ's reference to Pierce's statements that she lived independently, handled her self-care and personal hygiene, cared for multiple pets, went to yoga class, got along with medical providers and staff, and did not exhibit anger problems, reasonably supported his finding that she had less than marked limitations in her ability to adapt or manage herself.  ECF Doc. 17 at 8-9.  The Commissioner argues that the ALJ did not err in discounting Dr. Bradbury's and Dr. Harrington's opinions because they were inconsistent with the evidence and statements.  ECF Doc. 17 at 9-10.

### 1.    Listings Standard

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. pt. 404, Subpt. P, App 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is

impossible for a reviewing court to determine whether substantial evidence supported the decision).

Listings 12.04 and 12.15 establish the criteria for depressive, bipolar, and related disorders, and trauma- and stressor related disorders, respectively. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.15. To meet the Listings' severity level for Listings 12.04 and 12.15, the claimant must show that she meets the functional limitations criteria in Paragraphs B or C. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04, 12.15. To meet Paragraph B, the claimant must show that her disorder resulted in an extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.15(B).

The severity of a limitation is measured on a five-point scale that evaluates the claimant's ability to function in one of the above areas independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(F)(2). The five rating points are: (1) no limitation; (2) mild limitation (sightly limited functioning); (3) moderate limitation (fair functioning); (4) marked limitation (seriously limited functioning); and (5) extreme limitation (no ability to function). *Id.*

## 2. Analysis

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in concluding that Pierce's mental impairments did not meet or equal Listings 12.04 and 12.15. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ satisfied the first two requirements of *Reynolds* by evaluating Pierce's reported symptoms associated with her mental impairments, her reported daily activities, and the record evidence and comparing them to the

Paragraph B functional areas of her ability to concentrate, persist, or maintain pace and adapt or manage herself.  (Tr. 26); *Reynolds*, 424 F. App'x at 416.

Although the ALJ did not cite to specific exhibits at Step Three, when the decision is read as a whole, the evidence on which the ALJ relied on becomes apparent.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").  The ALJ's reference to Pierce's ability to drive, prepare meals, watch television, read, play games, manage funds, use the internet, handle self-care and personal hygiene, and care for her cats refer to her self-reported daily activities.  *Compare* (Tr. 233-40 (Exhibit 3E)), *with* (Tr. 26, 30 (citing Exhibit 3E at 5 (Tr. 237)).  The ALJ's statement that the evidence showed Pierce to have appropriate grooming and hygiene referred to Dr. Bradbury's and Dr. Harrington's questionnaire of her daily activities.  (Tr. 26, 30 (citing Exhibit 14F at 2, 17 (Tr. 651, 666)).  And the ALJ was not required to provide citations to support his findings that the record showed no mention of distractibility or problems with temper control or getting along with providers and staff.  *Meyer v. Comm'r of Soc. Sec.*, No. 1:12-cv-822, 2013 U.S. Dist. LEXIS 179886 at *15 (S.D. Ohio Dec. 20, 2013) ("It is illogical to require the ALJ to cite evidence that does not exist.").

The ALJ also gave a reasoned conclusion to support his Step Three finding.  The ALJ merely noted in his Step Three analysis an inconsistency between Pierce's alleged symptoms and her reported daily activities and the objective medical evidence.  (Tr. 26).  However, in his Step Four discussion, the ALJ expressly rejected Dr. Bradbury's and Dr. Harrington's opinion that Pierce had extreme limitations on the same two mental functioning areas because they were "inconsistent with more recent medical evidence of record and [Pierce's] activities of daily living."  (Tr. 31); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)

(factual findings elsewhere in the decision can support a conclusion at Step Three).  Thus,

reading the ALJ's decision as a whole, I conclude that the ALJ applied proper legal standards in

evaluating whether Listings 12.04 and 12.15 were medically equaled.  *See Reynolds*, 424 F.

App'x at 416.

Substantial evidence supported the ALJ's conclusion that Pierce had mild limitations in

her ability to concentrate, persist, or maintain pace, including: (1) psychiatric records through

November 2018 showing no cognitive impairment; (2) Dr. Bradbury's and Dr. Harrington's May

8, 2017 opinion that Pierce had a good ability to maintain attention but self-reported poor

attention; (3) neurological records showing intact memory and attention through December

2018; and (4) Pierce's statements in her function report that could pay bills, count change, and

manage a bank account.  (Tr. 236, 525, 652, 688, 695, 699, 821, 826, 832, 838, 852, 859, 978,

983, 987, 991, 1003, 1015, 1078).  Likewise, substantial evidence supported the ALJ's

conclusion that Pierce had moderate limitations in her ability to adapt or manage herself,

including: (1) counseling records indicating that Pierce had no impairment grooming or dressing,

appeared well groomed, and was cooperative; (2) psychiatric records indicating that Piece

appeared well groomed and was cooperative; (3) psychiatric records indicating that Pierce got

along with coworkers; (4) Dr. Bradbury's and Dr. Harrington's May 8, 2017 statement that

Pierce never appeared unkempt or unclean; and (5) Dr. Goldsmith's and Dr. Tangeman's

opinions that Pierce only had moderate limitations in this area.  (Tr. 91, 110, 685-86, 694, 699,

820, 825, 831, 838, 844, 849, 851, 977, 986, 990, 995, 1002, 1007, 1014, 1019, 1024, 1029).

Pierce cites records indicating a different conclusion could have been reached.  But the existence

of evidence supporting a claimant's position does not preclude an ALJ from concluding that

contrary evidence better characterized the claimant's limitations.  Even if a preponderance of the

evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ.[3]" *O'Brien*, 819 F. App'x at 416.

Because substantial evidence supported the ALJ's finding that Pierce did not satisfy the severity criteria of Listings 12.04 and 12.15, that decision fell within the Commissioner's "zone of choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 819 F. App'x at 416.  Accordingly, the ALJ's conclusion that Pierce's mental impairments did not meet or medical equal the severity criteria of Listings 12.04 or 12.15 must be affirmed.

### C.     Step Four – Weighing of Opinion Evidence

Pierce argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence when he gave "little weight" to Dr. Bradbury's and Dr. Harrington's March 7, 2017 and October 10, 2017 opinions regarding her mental RFC.  ECF Doc. 15 at 14-18.  Pierce argues that the ALJ failed to apply proper legal standards by not mentioning Dr. Harrington and evaluating what weight was to be afforded to her opinion – separate and apart from that of Dr. Bradbury's.  ECF Doc. 15 at 15.  Further, she argues that the ALJ failed to support his finding that Dr. Harrington's and Dr. Bradbury's opinions were based on self-reports and inconsistent with the evidence with citations to the record.  ECF Doc. 15 at 16-17.  She argues that reliance on a patient's self-reports is inherent in mental health treatment and could be used to discount the medical reports the ALJ otherwise relied on.  ECF Doc. 15 at 17.  Pierce contends that Dr. Harrington's and Dr. Bradbury's

---

[3] Pierce separately challenges the ALJ's decision to give little weight to Dr. Bradbury's and Dr. Harrington's opinion regarding her mental RFC.  In the interest of conciseness, the weight given to the Doctors' opinions on Pierce's mental RFC and the degree of limitation in her abilities to concentrate, persist, or maintain pace and adapt or manage herself will be addressed together below.

opinions should have been given controlling weight in light of the length of treatment and frequency of examinations (77 total sessions), their specialization, and the reasons they gave in support of their opinions.  ECF Doc. 15 at 15-16.  And their opinion was consistent with Keller's work questionnaire; Pierce's self-reported PTSD, anxiety, and depression; and treatment notes documenting her crying/crying spells.  ECF Doc. 15 at 17.

The Commissioner responds that, because the March and October 2017 letters were cosigned by Dr. Harrington, the ALJ did not err in not referring to Dr. Harrington separate from Dr. Bradbury.  ECF Doc. 17 at 14.  The Commissioner argues that the ALJ provided "good reasons" for discounting Dr. Bradbury's and Dr. Harrington's opinions because the ALJ indicated that they were inconsistent with the medical evidence.  ECF Doc. 17 at 14-15.  The failure to specifically cite to evidence, the Commissioner argues, was not error because the ALJ's opinion should be read as a whole, and the ALJ was not required to repeat all the evidence again in finding the Doctors' opinions inconsistent with the evidence.  ECF Doc. 17 at 15.

Pierce replies that, regardless of whether Dr. Harrington cosigned the letters, his adoption of the letters constituted separate opinions that had to be considered separate from Dr. Bradbury's.  ECF Doc. 18 at 4-5.  She otherwise repeats her arguments for why the Doctors' opinions were due controlling weight.  ECF Doc. 18 at 5-7.

### 1.    Medical Opinion Standard

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 404.1527(c).  An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with findings in the treating source's own records or other medical evidence in the case record.  20 C.F.R. § 404.1527(c)(2); *Biestek*, 880

F.3d at 786.  And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, he must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that decision.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6).  The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  Nevertheless, nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. § 404.1527(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations' procedural safeguard by stating good reasons for the weight given to the treating source's opinion).  Further, nothing in the regulations requires the ALJ to bifurcate his controlling weight and non-controlling weight analyses. *Cf. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (holding that an ALJ's one-sentence rejection of a treating physician's opinion satisfied section 404.1527(d)(2)'s "good reasons" requirement); *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) ("The ALJ

reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.'  This is a specific reason for not affording controlling weight to Dr. Lin.").

### 2.  Analysis

Pierce's challenge to the ALJ's failure to specifically mention Dr. Harrington is unavailing.  The letters submitted by Dr. Bradbury were cosigned by Dr. Harrington, making them joint opinions.  (Tr. 481, 650, 702).  Therefore, a discussion and rejection of Dr. Bradbury's opinions necessarily applied to Dr. Harrington's.  Moreover, a remand for the ALJ to make manifest what was plain in his discussion of the medical opinion evidence – that the opinions of both Dr. Bradbury and Dr. Harrington are the same, suffer from the same defects, and should be given little weight – would be futile.  *See Gavit v. Comm'r of Soc. Sec.*, No. 17-13066, 2018 U.S. Dist. LEXIS 219348 at *9 (E.D. Mich. Dec. 7, 2018) ("While the ALJ may have improperly identified Mr. Wood as 'Dr. Wood' in her analysis, there is no evidence that such a misidentification was anything by a harmless scrivener's error.").

The ALJ applied proper legal standards in weighing Dr. Bradbury's and Dr. Harrington's opinions.  The ALJ complied with the regulations by evaluating all the opinion evidence in light of the entire medical record and clearly stating the weight given to each medical opinion.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. § 404.1527(c); (Tr. 30-32).  The ALJ also articulated good reasons for giving Dr. Bradbury's and Dr. Harrington's opinions little weight when he explained that: (1) their March 7, 2017 opinion was inconsistent with more recent medical evidence and the claimant's activities of daily living; and (2) their October 10, 2017 opinion was based primarily on Pierce's self-reporting and was inconsistent with more recent medical evidence and her daily activities.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at

938; 20 C.F.R. § 404.1527(c); (Tr. 31).  The regulations did not require the ALJ to give a lengthy

discussion regarding his reasons, explicitly discuss each factor, or bifurcate his controlling

weight and noncontrolling weight analyses, as his discussion was sufficient to explain the

reasons he gave Dr. Bradbury's and Dr. Harrington's opinions little weight.  *Gayheart*, 710 F.3d

at 376; *Cole*, 661 F.3d at 938; *Francis*, 414 F. App'x at 804–05; *Allen*, 561 F.3d at 651; *Bledsoe*,

165 F. App'x at 412.  And the ALJ could discount a treating physician's opinion that is based on

a claimant's self-reports that are themselves not credible.  *Barnard v. Berryhill*, No. 1:17-cv-

02575, 2019 U.S. Dist. LEXIS 43853 at *31 (N.D. Ohio Mar. 18, 2019).

Substantial evidence supported the ALJ's conclusions that Dr. Bradbury's and

Dr. Harrington's opinions were not consistent with the more recent record evidence and Pierce's

daily activities.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes:

(1) psychiatric records through November 2018 showing no cognitive impairment;

(2) psychiatric and counseling records indicating that Pierce was well-groomed, dressed,

cooperative, not aggressive, logical, congruent, getting along well with coworkers, and able to

manage an anxiety provoking situation at work; (3) Dr. Bradbury's and Dr. Harrington's May 8,

2017 opinion that Pierce had good ability to maintain attention, came appropriately dressed,

never appeared visually unkempt or unclean, and was able to sustain concentration, persist at

tasks, and complete them regularly with mild to moderate distress; (4) neurological records

showing intact memory and attention through December 2018; (5) Dr. Goldsmith's and

Dr. Tangeman's opinions that Pierce had only moderate limitations in her ability to concentrate,

persist, or maintain pace and adapt or manage herself; and (7) Pierce's testimony that she always

made her payments on time, showered, dressed, drove to work, and worked part-time.  (Tr. 63-

64, 91, 110, 525, 652, 685-86, 688, 694-95, 698-99, 820-21, 825-26, 831-32, 838, 844, 851-52,

859, 977-78, 983, 986-87, 990-91, 995, 1002-03, 1014-15, 1019, 1024, 1029, 1078).  Evidence

also supported the ALJ's finding that Dr. Bradbury's and Dr. Harrington's October 10, 2017

opinion was based primarily on Pierce's self-reports because the letter cited no treatment records

and explicitly referenced Pierce's self-reported opinion that her symptoms impaired her ability to

function and perform well in a work setting.  (Tr. 702).

Because the ALJ adequately explained the weight he assigned to Dr. Bradbury's and

Dr. Harrington's opinions and because his finding that their opinions were based on Pierce's

self-reports and inconsistent with the objective medical evidence and Pierce's daily activities was

reasonably drawn from the record, the ALJ's decision to give their opinion "little weight" fell

within the Commissioner's "zone of choice" and cannot be second-guessed by this court.

*Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d a 877.  Accordingly, the ALJ's decision to

give Dr. Bradbury and Dr. Harrington's opinions "little weight" must be AFFIRMED.

**D.      Step Four – RFC Determination**

Pierce argues that the ALJ failed to apply proper legal standards and reach a decision

supported by substantial evidence in making his physical and mental RFC determinations.  ECF

Doc. 15 at 18-25.  Pierce accuses the ALJ of improperly "cherry-pick[ing]" the record to cite

only to evidence supporting a finding of non-disability.  ECF Doc. 15 at 18.  Specifically, she

argues that the ALJ ignored:

> 1.  The portion of her March 7, 2017 physical therapy assessment indicating that Pierce continued to suffer from lingering low back pain, required continued physical therapy, and did not completely meet her goal of decreasing pain;
>
> 2.  The portion of Dr. Harrington's October 6, 2016 evaluation stating that Pierce's physical health issues likely played a role in her ability to cope with past emotional trauma;

33

3.  The portion of Dr. Robb's March 22, 2017 treatment notes indicating that Pierce continued to struggle with PTSD, anxiety, and depression and his assessment for psychiatric illness and suicide;

4.  The portion of her August 9, 2017 counseling session indicating that the week before Pierce had taken a "nose dive" and suffered a panic attack, and the counselors observation that she presented as hostile, agitated, preoccupied, impulsive, and with tremors;

5.  The portion of her September 13, 2017 and October 23, 2017 psychiatric notes indicating that Pierce reported anxiety, lack of self-care, and low appetite, had active depression, and was to be monitored for bipolar disorder, racing thoughts, and increased speech, all despite her sobriety;

6.  Dr. Morton's August 20, 2018 treatment notes indicating that (i) in May 2018 Pierce suffered worsening depression and increased stress due to work and interpersonal issues with coworkers, (ii) in June 2018 she had increased anxiety, and (iii) in August 2018 she discontinued counseling;

7.  The portion of Pierce's December 19, 2018 counseling session summarizing her emotional distress;

8.  The portion of Dr. Bradbury's and Dr. Harrington's May 8, 2017 questionnaire stating that Pierce had a difficult history of relationships with family, friends, and neighbors;

9.  Records that Pierce's depression and PTSD remained, despite visiting friends and family, continuing to drink, and not appearing unkempt; and

10.  Records that Pierce suffered from crying spells or inappropriate crying during the relevant period.

ECF Doc. 15 at 19-23.

Pierce also argues that the ALJ failed to give "sufficient credence" to her: October 31, 2016 MRI; November 11, 2017 EMG showing mild bilateral carpal tunnel; and November 17, 2015 EMG showing demyelinating peripheral neuropathy.  ECF Doc. 15 at 23.  Based on those imaging tests, and her physical treatment records, Pierce argues that the ALJ should have found her restricted to sedentary work.  ECF Doc. 15 at 23-24.  She argues that her current part-time work supports a finding of disability because it shows what she cannot do, and the ALJ's finding

that her symptoms improved when she abstained from alcohol was not supported by the record. ECF Doc. 15 at 18.

The Commissioner responds that the citations to the record made by the ALJ provided substantial evidence supporting the ALJ's RFC determination. ECF Doc. 17 at 10-12, 16-18. The Commissioner argues that Pierce failed to show how the imaging evidence required a more restrictive RFC finding. ECF Doc. 17 at 17-18.

Pierce replies that the Commissioner engaged in the same selective citation to the record as the ALJ and reiterates that the ALJ engaged in improper cherry-picking. ECF Doc. 18 at 1-4.

### 1. RFC Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

In making his RFC assessment, the ALJ "may not cherry-pick facts to support a finding non-disability while ignoring evidence that points to a disability finding." *Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010). Claims of improper cherry-picking are "frequently made and seldom successful because crediting it would require a court to re-weigh record evidence." *Rosshirt v. Comm'r of Soc. Sec.*, No. 2:19-cv-3280, 2020 U.S. Dist. LEXIS 143295 at *12 (S.D.

Ohio Aug. 11, 2020).  What the claimant challenges as cherry-picking can just as readily "be described more neutrally as weighing the evidence."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

### 2.    Analysis

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Pierce's RFC.  The ALJ complied with the regulations by explicitly considering all of Pierce's impairments – severe or otherwise – in light of the objective medical evidence, medical opinions, and Pierce's statements regarding her symptoms.  20 C.F.R. §§ 404.1520(e), 404.1529(a); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 27-32).  The ALJ did not cherry-pick evidence, but based his decision on an exhaustive review of the record – including objective examination notes, treatment records, imaging test results, medical opinions, and non-medical source statements.  20 C.F.R. § 404.1529(a); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 29-32).  That the ALJ did not discuss every single record does not convince the court otherwise. *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004) (" But "[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (quotation marks omitted)).  He was not required to.  *Id.* A common-sense reading of the ALJ's decision shows that he did not cherry-pick evidence, but determined that the evidence cited in his decision supported a conclusion that the longitudinal record weighed in favor of his ultimate RFC finding.  *See White*, 572 F.3d at 284; *see also Solembrino v. Astrue*, No. 1:10-cv-01017, 2011 U.S. Dist. LEXIS 58237 at *25 (N.D. Ohio May 27, 2011) ("[A]n ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position.").

Further, substantial evidence supported the ALJ's mental RFC finding that Pierce could perform simple, routine, and repetitive tasks but not at a production rate; occasionally interact with supervisors, coworkers, and the public; and could tolerate few changes in a routine work setting, including: (1) Dr. Goldsmith's and Dr. Tangeman's opinions to that effect; (2) Dr. Bradbury's and Dr. Harrington's May 8, 2017 opinion that Pierce had a good ability to remember, understand, and follow instructions, maintain attention, sustain concentration and persist at tasks, difficulty coping with change, and visited friends and family several times per week; (3) Pierce's part-time work; (4) psychiatric records through November 2018 showing no cognitive impairment; and (5) psychiatric and counseling records indicating that Pierce was cooperative, not aggressive, logical, congruent, getting along well with coworkers, being more social and going out, and able to manage an anxiety provoking situation at work.  (Tr. 46-47, 64-65, 95-96, 114-15, 652, 665, 978-79, 982-87, 990-92, 995-96, 1002-03, 1007-09, 1014-15, 1019-21, 1024-26, 1029-31).

Although Pierce argues that the ALJ should have found her limited to sedentary work, substantial evidence supported the ALJ's finding that she could perform light work.  Such evidence included: (1) Dr. Das's and Dr. Ugbana's opinions that Pierce could perform the physical requirements of light work; (2) Pierce's March 7, 2017 physical therapy assessment showing decreased pain and that Pierce had eliminated her radicular symptoms, decreased her lower back pain, increased her range of motion and strength, could participate in two-hour yoga sessions without difficulty, and required only "some rest breaks" in doing household chores; (3) pain management treatment notes through August 2018 indicating that Pierce could stand from a seated position without difficulty, had mild limitation in the range of motion for her lumbar spine, and otherwise had a normal strength and range of motion; (4) imaging results

showing that Pierce's carpal tunnel was "mild;" (5) treatment records from her primary physician from November 2018 showing normal range of motion and reflexes; (6) neurological records showing full muscle power; and (7) February 2019 treatment notes indicating that Pierce had normal gait, alignment, and sensation in both legs.  (Tr. 98, 117, 476-77, 514, 518, 544-45, 611-12, 711-12, 716-17, 723-24, 727-28, 733-34, 741-42, 1055-56, 1092).  While Pierce contends that the ALJ should have given more "credence" to the imaging results, this court's role is not to re-weigh the evidence, but to determine whether substantial weight supported the conclusion reached by the ALJ.  *Jones*, 336 F.3d at 476.  It was.  Even if other evidence – or even a preponderance of the evidence – might have supported a more-restrictive RFC finding, the ALJ's findings respecting Pierce's RFC fell within the Commissioner's "zone of choice" because they were reasonably drawn from the record.  *O'Brien*, 819 F. App'x at 416; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545.  And this court cannot second-guess the ALJ's conclusion.  *O'Brien*, 819 F. App'x at 416; *Mullen*, 800 F.2d at 545.

Upon careful consideration of the record before the court, Pierce has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in evaluating Pierce's RFC.

## V.      Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Pierce's application for DIB be affirmed.

Dated: April 16, 2021

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).